## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT MICHIGAN
## SOUTHERN DIVISION

**CHINA MART USA LLC**
a California limited liability company,

Case No: 1:12-cv-00968

Hon. Robert J. Jonker

Plaintiff and Counterdefendant;

v.

**AMERICAREERS, LLC d/b/a CHINA MART, LLC**
a Michigan limited liability company,

Defendant and Counterclaimant.

---

## DECLARATION OF STEPHEN PERL IN OPPOSITION TO AMERICAREERS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, Stephen Perl, hereby declare and state that:

1.     I am over the age of 18, and I am competent to provide this declaration. I have personal knowledge of the facts set forth below. If called upon and sworn as a witness, I could and would competently testify as set forth below.

2.     I am the Chief Executive Officer ("CEO") of China Mart USA, LLC, the Plaintiff and Counterclaim Defendant (hereinafter "Plaintiff" or "China Mart") in the above-referenced case. I have been Plaintiff's CEO since the date that entity was formed on June 12, 2007. China Mart is a Limited Liability Company formed under the laws of the State of California.

1

3.      In addition to China Mart USA LLC, I also caused another entity, CMLA, LLC
(hereinafter "CMLA"), to be formed under the laws of the State of California on July 12,
2007. Although they are affiliates, CMLA is wholly separate entity from China Mart.

4.      I have personally worked on, have reviewed, and am readily familiar with, the
books, records and files concerning Plaintiff and CMLA. All of Plaintiff's and CMLA's
records referenced herein are kept in the regular course and scope of Plaintiff's and
CMLA's regular and usual business practices, including as described below.

5.      I know the following facts to be true of my own knowledge, or have gained such
knowledge from Plaintiff's and CMLA's business records which were made at or about
the time of the events recorded and which are maintained in the ordinary course of
Plaintiff's and CMLA's business at or near the time of the acts, conditions or events to
which they relate. Any such document or record was prepared in the ordinary course of
Plaintiff's and CMLA's business by a person employed by those businesses and who had
personal knowledge of the event being recorded and had a business duty to so accurately
record such event. That accuracy and trustworthiness results from the below-described
careful handling process of files and records.

    a.  Original Lease and Supporting Documents: Once the original documents and
accompanying documents evidencing a transaction between Plaintiff and CMLA
and its clients are executed, those documents are delivered to officers of Plaintiff
and CMLA whose duty it is to receive the executed original documents and
safeguard them. Those documents and copies of the corresponding subsequent
transaction documents are safeguarded by making copies of them when originals
have been provided, placing the copies in Plaintiff's and CMLA's file associated

2

with the client, and placing the originals of those documents in a separate documentation file in a secured area/department and in filing cabinets under constant surveillance. If the documents are thereafter needed and reviewed, after those records are reviewed, they are then replaced as soon as the work with the file and/or the records is done.

b. Trustworthiness: The foregoing methods have proven to be an accurate and trustworthy means for Plaintiff and CMLA in maintaining records and recording information about Plaintiff's and CMLA's dealings, as well as with respect to its clients. These records are and were utilized by Plaintiff's and CMLA's employees, including me, on a daily basis in the discharge of the normal and ordinary functions of Plaintiff and CMLA and its employees, and such records regularly are relied upon and are an accurate and proven means of reflecting the current situation with regard to each of Plaintiff's and CMLA's clients and corresponding accounts.

6. For many years prior to China Mart USA LLC's formalization as an entity, PM Factors, Inc. dba 1st PMF Bancorp (hereinafter "PMF") promoted PMF's business trade platform, the precursor to the China Mart Platform, through its branch network in China. In 2005, after several years of financing trade between companies located in China and the U.S., PMF established itself in China through a sister entity "Baoli Investments Consulting Company." PMF caused staff to be hired throughout China for its offices in Southern China in the cities of Hong Kong, Shenzhen, and Guangzhou (PMF later expanded its network to many other large cities throughout China). PMF would regularly fly its staff, from its headquarters in Los Angeles, to and from China to hold large

3

seminars supported by government and large commercial entities such as the Guangdong CCPIT, Shenzhen CCPIT, and Shenzhen and Shanghai governments.

7.      In 2006, PMF began to use China Mart as a new division, and used "ChinaMart" and "China Mart" as marks both in the United States and China. That use had actually commenced as of September 1, 2006. I do not know why China Mart's counsel indicated "intent to use" as the filing basis for "China Mart."

8.      China Mart is a sales and marketing platform for U.S. and Chinese companies that provides sales and marketing services to U.S. wholesalers and Chinese manufacturers. Commencing in 2006, many hundreds of thousands of dollars have been spent in advertising and infrastructure costs, to develop the "ChinaMart" and "China Mart" brands in both the United States and in China, by the trade lender which "spun off" (by way of assignment) the "ChinaMart" and "China Mart" brand (1st PMF Bancorp and its China affiliate "Baoli Investments Consulting Company") and then China Mart and its licensed affiliates including CMLA. A true and correct copy of redacted bank statements are attached with sealed Exhibit 1.

9.      Additionally, China Mart was advertised through a group "newsletter" emailing to all of my business contacts known throughout the United States and internationally, as 1st PMF Bancorp engages in financing throughout the U.S. and internationally through affiliates. Two samples of that advertising, which occurred in September 2006, are attached hereto as unsealed Exhibit 7.

10.      As I had advertised in my newsletters, "ChinaMart" and "China Mart" appeared at the Canton Fair, and the China Mart services platform was sold, including in "pre-lease/pre-location" service offerings. True and correct copies of signed pre-lease

4

agreements (pp. 006 – 23), signed in October, 2006, together with the English translation of that pro-forma document (pp. 024 – 029), are attached as sealed Exhibit 2.

11.     CMLA previously operated a physical location in Los Angeles (it has closed down as of early 2013) wherein Chinese manufacturers showcased their products for U.S. wholesalers. CMLA itself did not sell anything at this location: it simply provided a venue for producers to showcase their products in hope of attracting future wholesale contracts by leasing space on its premises. If a consumer walked into the CMLA location seeking to purchase a product such as a trashcan or a cell phone, they would not be able to do so. In this way, the location was akin to a convention center that provides a venue to producers who hope to connect to wholesalers through tradeshows in order to make future bulk sales. CMLA entered into leases with such manufacturers. One such CMLA lease is attached as sealed Exhibit 3.

12.     China Mart's brands are now registered trademarks: China Mart (Reg. 3537975) and ChinaMart (Reg. 4011626). In China Mart's applications with the United States Patent and Trademark Office, China Mart described its service as "[p]romoting the interests of foreign businesses entering the U.S. market; assisting foreign businesses in entering the U.S. market, namely by providing consultation services relating to finance, legal affairs, human resources, marketing, and accounting; promoting the goods and services of foreign companies in the U.S., namely by distributing advertising materials through a variety of methods." This statement is true, as China Mart's suite of services (the "China Mart Platform") that China Mart offers to its customers includes all of the above-mentioned services, as well as many other standard and optional services. A true

5

and correct copy of the type of "Concierge Services" which China Mart would have clients sign is attached as sealed Exhibit 4.

13.         After a partnership dissolved concerning use of the CMLA location, CMLA entered into a written commercial lease for use of that CMLA location. True and correct copies of excerpts of that "COMMERCIAL LEASE AGREEMENT" are attached as sealed Exhibit 5. The closure of CMLA does not impact the services that China Mart will continue to provide, as China Mart has continued to, and intends to continue engaging in "consultation services relating to finance, legal affairs, human resources, marketing, and accounting; promoting the goods and services of foreign companies in the U.S., namely by distributing advertising materials through a variety of methods."

14.         On June 10, 2007, because "chinamart.com" was not available when I looked to register that domain name, I registered the domain "ChinaMartUSA.com." Around that time, I also "spun off" China Mart as a new entity and registered it as "China Mart USA LLC". On the same day, I caused PMF to assign all right, title and interest to PMF's intellectual property and goodwill concerning "China Mart" or "ChinaMart", including the China Mart and China Mart marks.

15.         In 2007, instead of pursuing Mr. Rohland who owned "chinamart.com" before he sold the website to AmeriCareers, or taking any other action against Mr. Rohland when it could not buy the already-registered "chinamart.com," I simply registered "chinamartusa.com", and then assigned the domain to China Mart USA LLC. While China Mart hoped it could someday properly obtain that chinamart.com website, China Mart properly waited for a lawful opportunity to obtain it. It was my understanding that

6

the Rohland website was not being used in a manner that infringed China Mart's trademark rights.

16.     Additionally, I did not seek to have China Mart take action against any domain name holder with names similar to "China Mart" or "ChinaMart" because I was not, and am not, aware of any other domain name holder who is engaging in any conduct similar to AmeriCareers.

17.     I understand AmeriCareers is claiming that I said I was aware of confusion in 2006 through 2007, as AmericaCareers misinterprets what I said in response to Special Interrogatory 1 which had two time periods in the same question, "2006 through 2007" and then "later in 2010." What I was indicating was that in the 2006 through 2007 time frame, I found out that chinamart.com was owned by someone else. The "but then started noticing consumers were indicating confusion as to chinamart.com" was referring to the other time frame in the same question, "later in 2010."

18.     It was around June 2010 that, for the first time, I heard from several China Mart prospective clients and clients (both in China and the United States), that they were confused because they had tried to go onto China Mart's website, but they were not finding information on all of the services included in the China Mart Platform. In other words, they indicated to me that, while they were seeing the promotion and marketing of goods and products, they were not seeing the human resources, consulting and other business services (such as concierge services) that were being promoted as being part of the China Mart Platform. Additionally, several clients and prospects indicated to me that they had tried to contact "ChinaMart" through "ChinaMart.com," but they had not received return communications. I have no doubt that China Mart lost prospects because

7

of that confusion, and the lack of response after contacting ChinaMart.com. A true and correct copy of AmeriCareers' website, as it appeared around that time, is attached hereto as unsealed Exhibit 8.

19.       In response to this confusion, China Mart sought to make the actual confusion stop and sought to protect its rights. I therefore caused China Mart to send a cease and desist letter to AmeriCareers. A true and correct copy of that letter is attached hereto as unsealed Exhibit 9.

20.       Around July 13, 2010, AmeriCareers' attorney, John B. Berryhill, sent the letter attached hereto as unsealed Exhibit 10. In his letter to China Mart's attorney, Mr. Berryhill indicated that "[his] client is willing to consider placement of a courtesy link or other text at the sight when fully developed, **subject to a suitable agreement between our clients**." (emphasis added ). I understood that language to mean that AmeriCareers would not turn over the domain name, and instead wanted to enter into a negotiation to sell that domain name to China Mart.

21.       I did not believe AmeriCareers actually had any interest in actually developing a business with the domain name. But, to make sure, China Mart tried to determine whether actual prior commercial non-infringing use warranted paying an amount for the domain name. Accordingly, China Mart's counsel sent the letter attached hereto as unsealed Exhibit 11.

22.       Around September 20, 2010, AmeriCareers' attorney, John B. Berryhill, sent the letter attached hereto as unsealed Exhibit 12. In his letter to China Mart's attorney, Mr. Berryhill refused the request concerning showing of commercial use and indicated that "[m]y client is not using any 'China Mart' 'mark.'" (emphasis added ).

23.     AmeriCareers continued to have the same website it had as of July 10, 2010 until at least September 8, 2010 as reflected in Exhibit 8.

24.     It is, and was my belief that, to capitalize on the web traffic that was mistakenly going to AmeriCareer's "parking" website and to increase the purchase price AmeriCareers wanted from ChinaMart for the domain itself, AmeriCareers changed the website around October 2010, as reflected in Exhibit 13. However, when I have checked the website including in early 2011, the website mostly contains empty links which do not go anywhere. However, as reflected in Exhibit 13, AmeriCareers made no effort to disclaim any association with China Mart on the website.

25.     Based upon China Mart's investigation before the lawsuit was initiated, it is my understanding AmeriCareers has numerous registered trademarks (approximately 17 as of this date), and that Mr. Ouyang has registered over 300 domain names. A list of the current AmeriCareers' trademarks are attached hereto as Exhibit 15.

26.     The "China Mart" AmeriCareers "business" is not, and has never been, anything like AmeriCareers' stated business purpose or "total focus", which I found on AmeriCareers' website and which is attached hereto as Exhibit 16.

27.     China Mart then sued, since China Mart's efforts to resolve the issue with AmeriCareers proved to be unfruitful.

28.     It was only after China Mart sued AmeriCareers that AmeriCareers added a tiny disclaimer at the bottom of the website page. The current AmeriCareers website with the small disclaimer is attached hereto as unsealed Exhibit 14.

29.     China Mart has not sued any other domain name holder, including the ones which AmeriCareers mentioned such as "chinesemart.com" ,"china-mart.com", "chinasmart.com", or China-Mart.us, as those entities are not in any way confusing China Mart's customers or prospects and have not attempted to sell their websites to China Mart. Those entities are not using their domain names, as reflected in the true and correct copies of those websites which are attached hereto as Exhibit 17, in any manner likely to cause confusion with China Mart. Accordingly, China Mart has left them alone.

30.     When Chinese Vice President Xi Jinping's large Business Delegation visited Los Angeles in February 2012, the Delegation toured the CMLA facility, participated in speeches, and networked face to face with United States business persons. At the time, Xi Jinping was positioned to be China's next President, and supreme Chinese leader, and was expected to hold the positions of General Secretary of the Communist Party of China and Chairman of the Central Military Commission (which positions President Xi Jinping now holds).

31.     Due to the above efforts on its part, it is my strong belief that China Mart has indeed developed significant goodwill and status, both in the United States and China, and has become rather very well known in both countries. China Mart, its licensed affiliates, and clients using China Mart's services have generated many millions of dollars in income, using the China Mart brands and services to validate their status as legitimate business enterprises.

I declare that all statements made herein of my own knowledge are true and all statements made on information and belief are believed to be true; and further that these statements are made with the knowledge that willful, false statements and the like so made constitute perjury and are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Executed this 31st day of October 2013.

_____
Stephen Perl

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of October, 2013, a true copy of the foregoing was filed electronically with the clerk of the Court using the Court's ECF system, which will send notification of such filing to all attorneys of record.

## DECLARATION OF STEPHEN PERL IN OPPOSITION TO AMERICAREERS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

was filed and served via overnight delivery on the following counsel of record:

Nicholas D. Bowman
Waters & Associates, PLC
305B Waters Building
161 Ottawa Ave. N.W.
Grand Rapids, MI 49503
nick@waters-ip.com

s/Scott E. Shapiro
Scott E. Shapiro (Cal. Bar No. 194352)
APPELL SHAPIRO, LLP
15233 Ventura Boulevard, Suite 420
Sherman Oaks, CA 91403
Tel: (800) 625-7710/Fax: (818) 305-6925
scott@asattorney.com