## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT MICHIGAN
## SOUTHERN DIVISION

**CHINA MART USA LLC**
a California limited liability company,

Case No: 1:12-cv-00968

Hon. Robert J. Jonker

Plaintiff and Counterdefendant;

v.

**AMERICAREERS, LLC d/b/a CHINA MART, LLC**
a Michigan limited liability company,

Defendant and Counterclaimant.

/

John A. VanOphem (P48804)
Attorney for Plaintiff and Counterclaim
Defendant
**Bejin VanOphem & Bieneman PLC**
300 River Place Dr., Ste 1650
Detroit, MI 48207
Phone: (313) 528-4882
Fax: (313) 528-6982
vanophem@bvbip

Nicholas D. Bowman (P74964)
Attorney for Defendant and Counterclaim
Plaintiff
**Waters & Associates PLC**
305B Waters Building
161 Ottawa Ave., N.W.
Grand Rapids, MI 49503
Tel: (616) 242-9550
Fax: (616) 855-0954
nick@waters-ip.com

/

## PLAINTIFF CHINA MART USA LLC'S CORRECTED RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANT AMERICAREERS LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

By and through counsel, Plaintiff respectfully requests that this Honorable Court deny Defendant AmeriCareers, LLC's motion for partial summary judgment in this action.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

CONCISE STATEMENT OF THE QUESTIONS PRESENTED ............................................ iv

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF PURPORTED UNDISPUTED FACTS .................................................. 5

III.    STATEMENT OF ADDITIONAL MATERIAL FACTS.................................................... 8

IV.     LEGAL ARGUMENT........................................................................................... 10

    A.  The Standard for Summary Judgment.............................................................. 10

    B.  China Mart Has Superior Rights In and To "ChinaMart.com".......................... 10

    C.  China Mart Was A Valid Trademark Before AmeriCareers Registered The Infringing
        Domain Because The Mark Is Either Inherently Distinctive Or Acquired Distinctiveness...... 13

    D.  China Mart's Claims Are All Timely.............................................................. 14

    E.  AmeriCareers' Use of its Domain Name is NOT Fair Use and China Mart Will Prevail On
        Its ACPA Claim Because AmeriCareers is a Direct Competitor Who Registered the Infringing
        Domain-Which is Identical to the Mark-in Bad Faith.............................................. 15

    F.  China Mart Will Prevail On Its Trademark Infringement And Unfair Competition Claims
        Because AmeriCareers Used China Mart's Trademark And Caused Actual Confusion........... 18

    G.  China Mart's Trademark Registrations Were Not Procured By Fraud............................. 20

# TABLE OF AUTHORITIES

**Cases**

*20th Century Wear, Inc. v. Sanmark-Stardust Inc.*, 815 F.2d 8 (2nd Cir. 1987)............................................13

*Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233 (6th Cir. Mich. 1992)............................................10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................................................10

*Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir. 1999) ............................................................13

*Celotex Group v. Catrett*, 477 U.S. 317 (1986) .......................................................................................10

*Clark & Freeman Corp. v. Heartland Co. Ltd.,* 811 F.Supp. 137 (S.D.N.Y. 1993) ...................................11

*E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033 (S.D. Tex. 2001)............................13, 19

*Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir. N.Y. 1962).........................................16

*Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir.), cert. denied, 371 U.S. 910 (1962) ...17

*Ford Motor Co. v. Catalanotte*, 342 F.3d 543 (6th Cir. 2003)..................................................................14

*Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277 (3d Cir. N.J. 1991)..................................12

*GMC v. Lanard Toys, Inc.*, 468 F.3d 405 (6th Cir. Mich. 2006) ...............................................................18

*Kemin Industries Inc. v. Watkins Products, Inc.*, 192 USPQ 327 (TTAB 1976) ........................................20

*Kohler Manuf'g Co. v. Beeshore*, 59 F. 572 (3d Cir. Pa. 1893) ................................................................12

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190 (9th Cir. Wash. 2009)..............................................................13

*Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985)........................................................18

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2nd Cir. 1986) .................................13

*Luckie Magic Corp. v. McCall Manufacturing Co.*, 133 U.S.P.Q. 487 (T.T.A.B. 1962) ...........................11

*Marshak v. Green*, 505 F. Supp. 1054 (S.D.N.Y. 1981) ............................................................................12

*Metro Traffic Control v. Shadow Network, Inc.*, 104 F.3d 336 (Fed. Cir. 1997).......................................20

*Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006)............................................................14

*Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676 (7th Cir. Ill. 1982) .....................................11

*Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423 (4th Cir. Va. 2011) ..........5, 14, 15, 17

*OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176 (W.D.N.Y. 2000) ...........................................19

iii

*People for the Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915 (E.D. Va. 2000)....19

*Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165 (9th Cir. 2007)...........................................18

*Plus Products v. Natural Organics, Inc.*, 223 U.S.P.Q. 27, 1984 WL 33 (S.D.N.Y. 1984).......................16

*Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. Pa. 1986)............11

*Shields v. Zuccarini*, 89 F. Supp. 2d 634 (E.D. Pa. 2000)...........................................................19

*Smith International, Inc. v. Olin Corp.*, 209 USPQ 1033 (TTAB 1981) ......................................20

*Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F. Supp. 656 (E.D. Mich. 1992)............14

*Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370 (2d Cir. N.Y. 2003).........................................17

*Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. Fla. 1989)............12

*Tcpip Holding Co. v. Haar Communs.*, 244 F.3d 88 (2d Cir. N.Y. 2001) ..................................18

*Torres v. Cantine Torresella, S.r.l.*, 808 F.2d 46 (Fed. Cir. 1986).............................................20

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ....................................................13

*What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441 (4th Cir. Va. 2004)................14

**Statutes**

15 U.S.C. § 1052(a).......................................................................................................13

15 U.S.C. § 1052(f) .......................................................................................................14

15 U.S.C. § 1060 ...........................................................................................................11

15 U.S.C. § 1115(b)(4 ...................................................................................................17

15 U.S.C. § 1125(d)(1)(B)(ii).........................................................................................17

Fed. R. Civ. P. Rule 56...................................................................................................10

## CONCISE STATEMENT OF THE QUESTIONS PRESENTED

Whether the Court should grant Defendant and Counterclaim Plaintiff AmeriCareers, LLC's Motion for Partial Summary Judgment on the following issues:

1. Whether Defendant's rights in and to "ChinaMart.com" are superior to China Mart USA LLC's (hereinafter "Plaintiff") rights in Plaintiff's alleged marks "China Mart" and "ChinaMart";

    <u>Plaintiff</u>: No

    <u>Defendant</u>: Yes

2. Whether Plaintiff's claims are barred by the statutes of limitations and the doctrine of laches, unclean hands, fair use and estoppel;

    <u>Plaintiff</u>: No

    <u>Defendant</u>: Yes

3. Whether the terms "China Mart" and "ChinaMart" are generic when referring to China market or China trading center, or a place for selling or buying Chinese goods;

    <u>Plaintiff</u>: No

    <u>Defendant</u>: Yes

4. Whether Plaintiff's marks "China Mart" and "ChinaMart" are generic when used in connection with services recited in Plaintiff's two federal registrations at issue; and in the alternative, whether Plaintiff's marks "China Mart" and ChinaMart" are descriptive when used in connection with services recited in Plaintiff's two federal registrations at issue;

    <u>Plaintiff</u>: No

    <u>Defendant</u>: Yes

5. Whether Defendant has infringed Plaintiff's trademark rights;

    <u>Plaintiff</u>: Yes

    <u>Defendant</u>: No

6. Whether Plaintiff has committed fraud on the U.S. Patent and Trademark Office; and

Plaintiff: No

Defendant: Yes

7. Whether Plaintiff's alleged marks were distinctive at the time of registration of the domain name "ChinaMart.com" (or at any other time courts have held relevant to a determination of bad faith, including, but not limited to, the shifting of the focus of a website) and whether Defendant violated the Anticybersquatting Consumer Protection Act.

Plaintiff: Yes, Yes

Defendant: No, No

# I.    INTRODUCTION

Plaintiff China Mart USA LLC (hereinafter "China Mart") is a Limited Liability Company formed under the laws of the state of California. China Mart is a sales and marketing platform for U.S. and Chinese companies that provides sales and marketing services to U.S. wholesalers and Chinese manufacturers, including a suite of services which includes promotion, marketing, and· consultation services, as well as many other standard and optional services, labeled as the "China Mart Platform". Sealed Exhibit 4. Including the trade lender which "spun off" the ChinaMart brand (1st PMF Bancorp) started in 2006, many hundreds of thousands of dollars have been spent by ChinaMart and its licensed affiliates in advertising and infrastructure costs to develop the "ChinaMart" and "China Mart" brands. Sealed Exhibit 1. China Mart has been using and promoting the "China Mart" and "ChinaMart" marks (hereinafter the "Marks") since September, 2006. Sealed Exhibit 2; Exhibit 7.

China Mart's brands are now registered trademarks:  China Mart (3537975) and ChinaMart (4011626). In China Mart's application, it described its service as "[p]romoting the interests of foreign businesses entering the U.S. market; assisting foreign businesses in entering the U.S. market, namely by providing consultation services relating to finance, legal affairs, human resources, marketing, and accounting; promoting the goods and services of foreign companies in the U.S., namely by distributing advertising materials through a variety of methods". China Mart's suite of services (the "China Mart Platform") that it offers to its customers does indeed include all of the above-mentioned services, as well as many other standard and optional services. Sealed Exhibit 4.

In addition to China Mart USA LLC, there is also a separate entity called China Mart Los Angeles, LLC (hereinafter "CMLA") which was incorporated at a different time and is a wholly separate entity from China Mart USA, LLC. Perl Decl. ¶ 3.   China Mart Los Angeles operated a physical location in Los Angeles wherein Chinese manufacturers showcased their products for U.S. wholesalers. Sealed Exhibit 5. CMLA itself did not sell anything at this location and it was therefore not a marketplace; it simply provided a venue for producers to showcase their products in hope of attracting future wholesale contracts by leasing space on its premises. Perl Decl. ¶ 11. If a consumer walked into the CMLA location seeking to purchase a product such as a trashcan or a cell phone, they would not be able to do so. In this way, the location was akin to a

1

convention center that provides a venue to producers who hope to connect to wholesalers through tradeshows in order to make future bulk sales.

China Mart's rise and recognition in both China and the United States has been such that, when Chinese Vice President Xi Jinping's large Business Delegation visited Los Angeles, the Delegation toured the CMLA facility participated in speeches, and networked face to face with United States business persons. Perl Decl. ¶ 30. At the time, Xi Jinping was positioned to be China's next President, and supreme Chinese leader, and was expected to hold the positions of General Secretary of the Communist Party of China and Chairman of the Central Military Commission (which positions President Xi Jinping now holds). China Mart® has indeed developed significant goodwill and status, both in the United States and China, and has become rather very well known in both countries. Perl Decl. ¶ 31. China Mart, its licensed affiliates, and clients using China Mart's services have generated many millions of dollars in income, using the China Mart brands and services to validate their status as legitimate business enterprises. *Id.*

AmeriCareers, LLC (hereinafter "AmeriCareers") is a Limited Liability Company formed under the laws of the state of Michigan. AmeriCareers' stated business mission (as posted on its main website "Americareers.com") is, and has been, to: "to provide the most qualified college and university students with a seamless path through their post-graduate education, and then on to positions within the academic and science communities." AmeriCareers owns many websites (such as universityjobs.com, postdocjobs.com, siencejobs.org) in connection with job advertising and career related services. Exhibit 15.

Da Ouyang (hereinafter "Ouyang") is AmeriCareers' owner and president. Mr. Ouyang is a sophisticated, technologically savvy individual who has registered and currently controls over 200 domain names, and has obtained approximately 17 trademark registrations (apparently without the assistance of an attorney as no attorney was listed as AmeriCareers' legal representative). *See* Exhibit 17. Mr. Ouyang has also actually engaged in the registration and sale of domain names.

In contrast to China Mart's very significant direct and indirect expenditures on advertising and marketing, there is no evidence before the court that AmeriCareer's "Chinamart.com" and "China Mart, LLC" have ever spent any money on advertising. Sealed Exhibit 1. As for commercial activity, China Mart earns large sums every year from China Mart

2

Platform which includes promotion, marketing, and consultation services, as well as many other standard and optional services. Perl Decl. ¶ 31. AmeriCareers, despite acting as another marketing voice for Amazon.com through an affiliate program, has apparently only helped Amazon sell a nominal amount of product and based on that, earned an even smaller amount in commissions for its promotion and marketing of Amazon's products (as "Advertising Fees"). Sealed Exhibit 6.

Prior to starting the "goods sale" business through "chinamart.com" and registering "CHINAMART.COM THE SAVINGS CONTINUE" on July 21, 2010, AmeriCareers simply parked the chinamart.com domain, and let it sit without commercial activities, for more than 30 months. It was only after AmeriCareers received a sign of interest, or "bite," from China Mart by way of a cease and desist letter, that AmeriCareers finally got the attention it had been seeking for the website. AmeriCareers' response to China Mart's cease and desist letter was to try increase the "value" of the site, by claiming it was not a trademark use (while simultaneously seeking more infringing trademarks) and claiming to engage in an different business. In short, AmeriCareers' "Chinamart.com" marketing business, started in 2010, is nothing but a sham and bad faith attempt to hold the "chinamart.com" domain name for a ransom.

This case involves AmeriCareers' infringement of China Mart's exclusive rights in the common law and US registered Marks ("China Mart®" and "ChinaMart®") and cybersquatting on the domain name "chinamart.com" or "ChinaMart.com." AmeriCareers takes a "why me?" defense approach in this litigation, and claims that it is engaging in a "fair use" of the "ChinaMart" mark. AmeriCareers claims that there are many other domain names using "china" or "mart" or derivatives thereof, claiming ChinaMart is generic and that there are many other "prior" users of similar or almost identical names (such as "chinamarts.com" or "china-mart.com"). Yet, every example of the purported "prior" user is a non-functioning website no longer in commercial use, if it ever was, and other website domain names have not presented the actual confusion that has resulted from AmeriCareers' trademark efforts concerning "ChinaMart." Exhibit 17. Thus, although China Mart reserves all rights to do so, China Mart has not pursued those other persons for cybersquatting and trademark infringement, the reason being that this is not a "reverse domain name hijacking" (where trademark users try to obtain websites that followed their trademark registrations) case.

3

In 2007, instead of pursuing Mr. Rohland who owned "chinamart.com" before he sold the website to AmeriCareers, or taking any other action against Mr. Rohland when it could not buy the already-registered "chinamart.com," Stephen Perl simply registered "chinamartusa.com", and then assigned the domain to China Mart USA LLC. Perl Decl. ¶ 14. While China Mart hoped it could someday properly obtain that chinamart.com website, China Mart properly waited for a lawful opportunity to obtain it since the initial Rohland website was not infringing China Mart's exclusive rights in its registered Marks. Perl Decl. ¶ 15; *See* Defendant's Exhibit A ¶¶ 9, 10.

Then, in 2010, China Mart prospects and clients began to indicate they were going to China Mart's website (apparently inadvertently going to "chinamart.com" instead of "chinamartusa.com") and were confused because they were not finding information on all of the services included in the China Mart Platform. In other words, they indicated that, while they were seeing the promotion and marketing of goods and products, they were not seeing the human resources, consulting and other business services (such as concierge services) that were included in the China Mart Platform. Perl Decl. ¶ 18. So, China Mart did what every other trademark owner does in that situation, it sought to make the actual confusion stop and protect its exclusive rights and therefore sent a cease and desist letter to AmeriCareers. To China Mart's dismay, AmeriCareers did not heed China Mart's warning, and instead deemed it a business opportunity (albeit in bad faith): AmeriCareers found a buyer for the failed "chinamart.com" site. But, how could it increase the price China Mart would have to pay? With Mr. Ouyang's lead, AmeriCareers would now pretend to want to enter into a totally different business model, selling Chinese goods and claiming it was "descriptive use" or "fair use" while simultaneously improperly pursuing trade name and trademark rights as to "China Mart."

As demonstrated below, AmeriCareers' unlawful and infringing misuse of China Mart's Marks—including as demonstrated by AmeriCareers' "foray" into a totally different business **right after** AmeriCareers received a cease and desist letter and **after** a highly sophisticated IP attorney, John Berryhill, made a business proposition to engage in negotiations over use of the domain name—reeks of bad faith. AmeriCareers claims it is insulated from any finding of bad faith because it obtained "prior use" rights from Mr. Rohland and those rights preclude a cybersquatting claim. However, AmeriCareers ignores that a cybersquatting claim arises when the domain name owner engages in bad faith even after it acquires the domain name. As

4

demonstrated below, there clearly is a continuing "good faith" component to use a domain name, a legal precedent first expressed in a published 2003 Federal Court Appellate Opinion authored by none other than our current Chief Justice Sotomayor (in a case cited in the 6th Circuit on other grounds). That legal position has since been adopted by other Federal Appellate Circuits as well, including in a case with similar facts to this case wherein a defendant claimed his initial use and registration was legitimate, but which use then unmistakably turned to the dark side. *See Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 438 (4th Cir. Va. 2011).

## II.    STATEMENT OF PURPORTED UNDISPUTED FACTS

Defendant's predecessors' uses of "ChinaMart.com":

- Immaterial: Defendant's domain name "chinamart.com" was initially registered on January 23, 1998 (see Doc #6-5 for Exhibit 7).

- Immaterial: Defendant was unable to collect information about the use of the domain name "chinamart.com" prior to the year 2005.

- Undisputed: However, it is known that sometime prior to April 2005, Mr. Gary Rohland, a resident in Florida, bought the domain name "chinamart.com."

- Disputed: Through his established business "Florida eCommercials Inc.", Mr. Rohland had used "ChinaMart.com" as a trade name in commerce since April 2005 (see Exhibit B for Rohland Dec. and its Exhibit 1).

- Disputed as to when use ended: According to Mr. Rohland, one of his first uses of "ChinaMart.com" beginning in April 2005 was to "offer internet commercial advertising services and develop video commercials for use on internet websites."

- Disputed as to continued use: He offered the services of Chinese speaking actors to assist in making commercials.

- Disputed as to continued use: During some periods from 2005 to 2007, Mr. Rohland also used "ChinaMart.com" to advertise third party services related to ecommerce, online shopping, Chinese business, Chinese trade and Chinese travel (see Exhibit B).

- Disputed as to continued use: On May 7, 2007, Mr. Rohland registered his company "ChinaMart.com Inc." in Florida and began to "develop www.chinamart.com as a distinctive business to business trade portal with the goal of having a presence in both

5

China and the U.S. to better service the business communities of both countries" (see Exhibit B).

Defendant's use of "ChinaMart.com":

- Undisputed: On December 25, 2007, Defendant's president Mr. Da Ouyang acquired "ChinaMart.com" from Mr. Rohland, and the domain was transferred to Mr. Ouyang on January 2, 2008 (see Exhibit A for Ouyang Declaration ("Ouyang Dec.") ¶ 7).

- Disputed, used as trade name not new company: On December 26, 2007, Mr. Ouyang created a company "China Mart, LLC" in Michigan (see Doc#1-3).

- Disputed as to bad faith intent: Defendant's intention with this acquisition was to use "ChinaMart.com" to build an online trading and shopping site for selling goods and products made in China.

- Disputed: Since the acquisition, Defendant has continued the use of ChinaMart.com in commerce for advertising third party services related to China business, China trading and online shopping during 2008, 2009 and 2010 (see Ouyang Dec. ¶¶ 8, 9).

- Disputed, no "integration", simply linking to some Amazon goods: Since late July 2010, the website "ChinaMart.com" has been integrated with the US internet retailer, Amazon.com, and has been used as Defendant's online China trading and shopping center, for selling goods available on Amazon.com's website, many of which are made in China (see Ouyang Dec. ¶¶ 10,26 and Exhibits C and A-26-4).

- Disputed: Defendant had no knowledge about the existence of Plaintiff or Plaintiff's use of the term "China Mart" or "ChinaMart" until Defendant received a letter from Plaintiff's attorney in July 2010.

- Disputed: Nor has Defendant approached Plaintiff or any third party, in an attempt to sell its domain name to them.

- Disputed: While Defendant is not aware of any incidents of actual confusion, Defendant voluntarily added a disclaimer on every page of Defendant's website, after this lawsuit started, to avoid any possible confusion (see Ouyang Dec. ¶¶ 11,12,13,18 and Exhibit C).

Plaintiff's use of its alleged marks:

6

- Disputed, Stephen Perl registered, then assigned to China Mart: Plaintiff registered its domain "chinamartusa.com" on June 10, 2007 (see Doc #6-3) and registered its company "China Mart USA LLC" on June 12, 2007 in the state of California (see Doc #6-2).

- Undisputed: On June 12, 2007, Plaintiff filed an application to register its alleged mark "CHINA MART" (Plaintiff has used it as "China Mart") on an "intent-to-use" basis with the U.S. Patent and Trademark Office (hereinafter "the PTO") and it was registered on November 25, 2008 (Reg. No. 3537975).

- Undisputed: Plaintiff filed another application to register the alleged mark "CHINAMART" (Plaintiff has used it as "ChinaMart") with the PTO on December 23, 2010 and it was registered on August 16, 2011 (Reg. No. 4011626).

- Undisputed: In both registrations, Plaintiff claimed its first use date as September 1, 2006. Service descriptions for these two registrations at issue (the "recited services") can be found in Doc #1-2.

- Immaterial, irrelevant: In December 2007, Plaintiff applied to register "China Mart" as a trademark in China and the application was refused by the Chinese trademark office (see Ouyang Dec.¶ 23, Exhibit A-2).

- Admitted: Plaintiff has admitted it has used "China Mart" and "ChinaMart" interchangeably for its services (see Exhibit D-1 for Req.No.30).

- Undisputed: Plaintiff "chose 'China Mart' and 'ChinaMart' as a name to suggest the types of services ChinaMart was to provide" (see Exhibit D-2 for Interrogatory No.11).

- Undisputed: Plaintiff admitted that it had not used its alleged marks "China Mart" or "ChinaMart" prior to the year 2006 (see Exhibit D-3 for Req. No.1).

- Undisputed: In 2006, Plaintiff became aware of the use of "ChinaMart.com" by Defendant's predecessor, Mr. Rohland (see Exhibit D-2 for Interrogatory No. 14, and Exhibit D-4 for Interrogatory No.1).

- Disputed: When Plaintiff chose to use www.chinamartusa.com for its business, Plaintiff started noticing that customers confused its website with the www.chinamart.com website (see Exhibit D-4 for Interrogatory No.1).

- Disputed: Plaintiff has used "China Mart Los Angeles" (or "CMLA") for its business name (see below).

7

- Disputed: Plaintiff's customers are "factories from China and USA wholesalers who buy from" Plaintiff (see Exhibit D-2 for Interrogatory No.5).

- Disputed, confusion between China Mart Los Angles and China Mart: Plaintiff has claimed that its ChinaMart is an "international trading center" (see below). As stated by Plaintiff, Plaintiff's services primarily involve the facilitation of trading with China:

- "China Mart's main goal is to grow its Chinese Manufactures sales in the US..." (see Doc #6-5 for Exhibit 9 on Page ID#103-105)

- "China Mart(TM) will assit Chinese companies' growth and investment for entry into the U.S. market. CMLA provides selling/ showroom offices while also providing a complete marketing, management and administrative service packages for Chinese companies wishing to sell direct and establish a presence in the U.S." (see Doc#6-5 for Page ID#108)

- "ChinaMart® Los Angeles has launched, ...bringing Chinese companies into the U.S.... It is now a fully operational physical and virtual international trading center , utilizing the ChinaMart® Los Angeles facility next to LAX, as well as the strong website presence ..." (see Doc#6-4 for Page-ID#68).

- "What is ChinaMart? ChinaMart is a service and support platform to facilitate sales of U.S. and Chinese products between both countries." (see Ouyang Dec. ¶¶ 24 and Exhibit A-3)

- "ChinaMart's primary directive is to serve as a bridge and resource to sell large quantities of product to the U.S. and Chinese markets, while providing 'After-Sales Customer Service' that is essential when selling in the US markets.......

- Company Profile Since 2006, ChinaMart® has been the first USA platform dedicated to sales of U.S. and Chinese products in a variety of areas such as furniture, electronics and many others." (see Exhibit D-3 for Req.No.6 for Bates Nos. AMC000025-AMC000026)

### III.    STATEMENT OF ADDITIONAL MATERIAL FACTS

AmeriCareers' predecessors' alleged uses of the Website: the chinamart.com domain name (the "Domain Name") was originally registered on January 23, 1998. Sometime prior to April, 2005, Mr. Gary Rohland (hereinafter "Rohland") bought the Website. As of April 13, 2005, the Domain Name only contained an ad which offered to advertise a customer's products

on the website. Defendant's Exhibit B, ¶ 1. On May 7, 2007, Rohland registered "ChinaMart.com Inc." in Florida. Defendant's Exhibit B ¶ 5. However, Rohland's advertising venture failed, and the company abandoned any and all commercial use of the Domain Name. Defendant's Exhibit B, ¶¶ 6, 7. As such, as of August, 2005, the Domain Name had been parked with third party service providers who placed computer-generated ads on it. *Id.* The Domain Name stayed parked in this fashion until Rohland sold it to AmeriCareers in 2007. *Id.*

AmeriCareers' alleged use of the Website: In December, 2007, Ouyang acquired the Domain Name from Rohland. Defendant's Exhibit A ¶ 7. Also in December, 2007, Ouyang created "China Mart, LLC" in Michigan. Upon acquiring the Website, AmeriCareers continued to park the Domain Name with third party service providers who placed computer-generated ads on it. That parking continued for years. Defendant's Exhibit A ¶ 9. On July 7, 2010, China Mart, immediately after having learned that some of its customers were being confused because they were not finding information for all of the services in the China Mart Platform on chinamart.com, sent a letter to AmeriCareers regarding its infringement of China Mart's Marks. Perl Decl. ¶ 17; Exhibit 9. In response, AmeriCareers' attorney at the time John B. Berryhill (hereinafter "Berryhill") declined to act and indicated "as an entirely voluntary measure, my client is willing to consider placement of a courtesy link or other text at the sight when fully developed, **subject to a suitable agreement between our clients.**" Perl Decl. ¶ 20; Exhibit 10 (emphasis added). Soon thereafter, in late July, 2010, after doing nothing with the Domain Name for more than 30 months, AmeriCareers shifted the focus of the Domain Name from parking, essentially doing nothing, to selling Chinese products for the first time in its existence. Defendant's Exhibit A ¶ 10.

China Mart's use of its Marks: For many years prior to China Mart USA LLC's formalization as an entity, PM Factors, Inc. dba 1st PMF Bancorp (hereinafter "PMF") promoted PMF's business trade platform through its branch network in China. Sealed Exhibit 1; Perl Decl. ¶ 6. In 2005, after several years of financing trade between companies located in China and the U.S., PMF established itself in China through a sister entity "Baoli Investments Consulting Company." Sealed Exhibit 1; Perl Decl. ¶ 6. PMF caused staff to be hired throughout China for its offices in Southern China in the cities of Hong Kong, Shenzhen, and Guangzhou (PMF later expanded its network to many other large cities throughout China). Perl Decl. ¶ 6. PMF would

9

regularly fly its staff, from its headquarters in Los Angeles, to and from China to hold large seminars supported by government and large commercial entities such as the Guangdong CCPIT, Shenzhen CCPIT, and Shenzhen and Shanghai governments. Perl Decl. ¶ 6. In 2006, PMF began to use China Mart as a new division. Perl Decl. ¶ 7. Because "chinamart.com" was not available, PMF then registered the domain "ChinaMartUSA.com" and spun off China Mart as a new entity and registered it as "China Mart USA LLC" on June 12, 2007. Perl Decl. ¶ 14. On the same day, PMF assigned all right, title and interest to PMF's intellectual property regarding China, including the ChinaMart and China Mart marks which by that time had been accruing common law trademark status. Perl Decl. ¶ 14.

## IV.    LEGAL ARGUMENT

### A.    The Standard for Summary Judgment

Summary judgment is inappropriate where there is a "genuine dispute as to any material fact" or the moving party is not "entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Group v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The Court must draw all inferences in a light most favorable to the non-moving party. *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. Mich. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).

### B.    China Mart Has Superior Rights In and To "ChinaMart.com"

China Mart's assignor began using "China Mart" as a trade name in September, 2006 but AmeriCareers did not acquire "ChinaMart.com" from Rohland until December, 2007. While Rohland did in fact begin using "ChinaMart.com" as a trade name before China Mart did, as explained below, AmeriCareers and Rohland cannot tack their time together for at least three reasons, any one of which defeats AmeriCareers' "superiority" claims. Consequently, China Mart is the senior user of the Marks.

10

First, Rohland and AmeriCareers cannot tack their time together because there was never an assignment of any common law rights between them. It is only after a "proper assignment" that an assignee steps into the shows of the assignor. *Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. Pa. 1986). To date, AmeriCareers has never purported to have been assigned any rights whatsoever in the Marks. While AmeriCareers apparently paid $5,000.00 to Rohland for the purchase and transfer of the "ChinaMart.com" domain, no trademark assignment took place, as Ouyang "believed and [continues] to believe that [the Mark] is generic or highly descriptive when used in connection with buying and selling goods." Defendant Exhibit A ¶ 14. In addition, courts have held that, in a purchase of assets with no reference to trademarks or goodwill, there is no effective assignment of trademark rights. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676 (7th Cir. Ill. 1982) (citing to *Luckie Magic Corp. v. McCall Manufacturing Co.*, 133 U.S.P.Q. 487 (T.T.A.B. 1962)). Thus, because there was no assignment, the clock did not start running for AmeriCareers' claimed priority rights until December, 2007 (over a year after China Mart began using the Marks). For this reason, China Mart is, in fact, the senior user.

Second, even if an assignment were to be later alleged by AmeriCareers, such an assignment would be ineffective as it was an "assignment in gross". For an assignment to be valid, the mark and its associated goodwill must both be assigned. *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 676 (7th Cir. Ill. 1982). Notably, while *15 U.S.C. § 1060* only applies to registered marks, "it parallels the common law rules of trademark assignment." *Clark & Freeman Corp. v. Heartland Co. Ltd.,* 811 F.Supp. 137 (S.D.N.Y. 1993) (citations omitted). Thus, the courts have treated registered and unregistered marks alike in considering assignments in gross.

The purpose for this requirement is to protect customers from deception and confusion. *Money Store* at 678. In the case of a service mark, where there are no assets to transfer, the assignor and assignee must provide similar services. Id. In this case, AmeriCareers advertises third party goods and services. Defendant Exhibit A ¶ 9. Rohland, on the other hand, simply parked the Domain Name with third party service providers until he sold it to Ouyang. Defendant Exhibit B ¶ 7. Essentially, what Rohland did was rent out his website to third parties,

11

just like a landlord would rent out an apartment, which is nothing like AmeriCareers' activities. Moreover, even if Rohland and AmeriCareers did provide the same service, it would still be an assignment in gross, as the management has changed. *Marshak v. Green*, 505 F. Supp. 1054, 1061 (S.D.N.Y. 1981) (finding assignment valid because the band would continue to provide same quality and style of music under same management).

Finally, as discussed below, Rohland's use of the Marks is insufficient to grant him any trademark rights because he did not use the Marks "in commerce" during the time period in which he owned the Website. For this reason, even if AmeriCareers were to allege an assignment, such assignment would not grant AmeriCareers any additional rights.

Even assuming, *arguendo*, that AmeriCareers and Rohland could tack their time together, AmeriCareers still would not prevail. Ownership of an unregistered trademark requires a showing of continuous use of the mark. *Ford Motor Co. v. Summit Motor Products, Inc.*, 930 F.2d 277, 292 (3d Cir. N.J. 1991). Specifically, actual and continuous use in commerce is necessary to create a protectable interest in a mark. *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1022 (11th Cir. Fla. 1989). Moreover, "there must be shown an actual intention to acquire such [trademark rights]." *Ford Motor Co.* at 292 (citing to *Kohler Manuf'g Co. v. Beeshore*, 59 F. 572, 574 (3d Cir. Pa. 1893)). Here, the question is which party began to use the Marks **in interstate commerce** first. In August, 2005 (the month before China Mart began using the Marks as a trade name), Rohland had the Domain Name parked with third parties who were using the Domain Name to advertise for others. Defendant Exhibit B ¶ 7. Then, AmeriCareers parked the Domain Name for another 30 months. *See* Defendant's Exhibit A ¶¶ 9, 10. Such parking is not a commercial activity, but is simply the rental of one's website to a third party who places advertisements on the Domain Name with the hope that consumers will stumble onto the Domain Name and click its boilerplate advertisements. In other words, parking is what domain owners do when they are not engaged in commerce or cannot find a commercial use for a website. Thus, since parking is a lack-of-commerce, rather than commerce itself, Rohland failed to create a protectable interest during the periods during which he parked the Domain Name (apparently up until he sold the Domain Name to Ouyang), which further confirms China Mart is the senior user.

12

**C.** **China Mart Was A Valid Trademark Before AmeriCareers Registered The Infringing Domain Because The Mark Is Either Inherently Distinctive Or Acquired Distinctiveness.**

The Marks here are presumptively distinctive, as courts have held that "federal registration of a mark... creates a presumption that the mark is distinctive." *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 876 (9th Cir. 1999); see also *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2nd Cir. 1986) (because registered trademarks are presumed distinctive, they should be afforded the utmost protection); *E. & J. Gallo Winery v. Spider Webs Ltd.,* 129 F. Supp. 2d 1033, 1038 (S.D. Tex. 2001) (registered marks are presumed distinctive). Here, China Mart had "China Mart" registered on November 25, 2008 and had "ChinaMart" registered in December, 2010. Due to these registrations, there is a presumption that the mark is distinctive.

The Marks here are also distinctive under other tests. A mark is inherently distinctive if it is suggestive, arbitrary or fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763 (1992). A descriptive mark that is not inherently distinctive can still acquire distinctiveness-also called "secondary meaning"-and gain trademark protection. *See 15 U.S.C. § 1052(a).* The Marks have acquired distinctiveness through secondary meaning. AmeriCareers' registration and monetization of the chinamart.com domain name, especially AmeriCareers' shift from parking its website to selling Chinese goods after learning that China Mart's customers were mistakenly going to its website in search of China Mart, constitutes the evidence of distinctiveness through secondary meaning. *20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 815 F.2d 8, 10 (2nd Cir. 1987) (a finding of intentional copying of a mark is persuasive, if not conclusive, evidence of secondary meaning).

A mark is suggestive if "imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1198 (9th Cir. Wash. 2009). A mark is descriptive if it "defines a particular characteristic of the product in a way that does not require any exercise of the imagination." *Id.* Here, a mental leap is required to make the connection between the mark China Mart and many of the services China Mart offers.

But even *assuming arguendo* that CHINA MART is descriptive, it has acquired distinctiveness within the marketplace. Secondary Meaning is the consumer's association of the mark with a particular source. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 991-92 (9th Cir. 2006). And when a mark has been in substantially exclusive use for five years or more, there is prima facie evidence of secondary meaning and protectability under the Lanham Act. *See 15 U.S.C. § 1052(f)* (emphasis added); *see also 2 McCarthy on Trademarks and Unfair Competition § 15:62 (4th ed.)*. By September, 2011, China Mart had been doing business under the Marks for five (5) years, and had become very well known in China and the United States. It indeed was a big deal to host China's Vice President Xi Jinping's Business Delegation for an afternoon in February 2012. Unlike China Mart, AmeriCareer has nothing but a shell "business" which is merely another link to Amazon.com. Such use by AmeriCareers does not even qualify as "re-branding" of Amazon.com, which re-branding use would also fail to qualify as necessary commercial use so as to give AmeriCareers any rights in "China Mart."

**D.    China Mart's Claims Are All Timely**

Arguably, the statute of limitations in certain claims in this action is 3 years. *Sprinklets Water Center, Inc. v. McKesson Corp.*, 806 F. Supp. 656, 663 (E.D. Mich. 1992). However, there is no statute of limitations for Lanham Act actions, although courts can apply the laches doctrine in certain cases. *Audi AG v. D'Amato*, 381 F. Supp. 2d 644, 654 (E.D. Mich. 2005); *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003).

Laches does not bar recovery in this action. As to the ACPA claims, laches does not even apply. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 438 (4th Cir. Va. 2011). As to other claims, "regardless of when the trademark owner initially discovers the use of a similar mark, action against the infringing user is not necessary until, in light of the circumstances, the 'right to protection has clearly ripened.'" *What-A-Burger of Va., Inc. v. Whataburger, Inc.*, 357 F.3d 441, 449 (4th Cir. Va. 2004). A Court's consideration of laches in the trademark context should encompass at three questions: (1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement was excusable or reasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay. Id.

14

As to the first element, China Mart learned of the existence of the Domain Name early on. However, infringement requires more than simply the registration of a domain. For the first few years of its existence, the Domain Name was essentially dormant as it was being parked. AmeriCareers claims that China Mart claimed the confusion began in 2007. However, what China Mart actually said was China Mart noticed confusion sometime after China Mart began using "ChinaMartUsa.com" in connection with China Mart business. Defendant's Exhibit D-3. In fact, China Mart learned that confusion was taking place immediately prior to China Mart's July, 2010 letter to AmeriCareers. Upon learning of this confusion, China Mart immediately began legal proceedings, including through the letter itself and this litigation. As to the second element, there was no delay, as China Mart acted immediately and forcefully to protect its rights upon learning of the confusion. Finally, there is no prejudice here, as AmeriCareers simply had the Domain Name parked until receiving China Mart's letter. It was not until after China Mart notified AmeriCareers in early July, 2010 that its customers had mistakenly gone to AmeriCareers' Website that AmeriCareers actually began to use its website to sell goods. Defendant's Exhibit A ¶ 10. Such capitalizing on the confusion it created is not prejudice, but is actually evidence of bad faith as will be discussed below.

## E.  AmeriCareers' Use of its Domain Name is NOT Fair Use and China Mart Will Prevail On Its ACPA Claim Because AmeriCareers is a Direct Competitor Who Registered the Infringing Domain-Which is Identical to the Mark-in Bad Faith

China Mart's ACPA claim is valid and can go forward. To establish an ACPA violation, a plaintiff is required to (1) prove that the Defendant had a bad faith intent to profit from using the domain name, and (2) that the domain name is identical or confusingly similar to, or dilutive of, the distinctive and famous mark. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. Va. 2011). As to the first element, AmeriCareers' bad faith is demonstrated by the fact that it purchased the Domain Name from Rohland in December, 2007 knowing that the name of the Domain Name was trademarked and was being used in commerce by China Mart. Such knowledge is demonstrated by the fact that China Mart's website had been online and active for over six months and a simple Google search would have alerted Ouyang that there was a senior user of the Mark. In fact, AmeriCareers' own attorney suggests that a Google search is the best way to check for infringement issues before purchasing a domain. In

addition, Ouyang owns at least 398 domains and is therefore sophisticated in purchasing domains. For this reason, he would not have blindly spent $5,000.00 on a website without first checking for trademark issues. Other evidence of AmeriCareers' bad faith is that AmeriCareers parked the Domain Name until July, 2010. This does not comport with a claimed intention to "[become] involved in international trading between [China and the United States]," but rather, is something that a bulk domain purchaser would do while they wait for offers to sell the domain. Defendant Exhibit A ¶ 5.

As to the second element, the Domain Name (ChinaMart.com) is identical to the Marks (ChinaMart and China Mart). These Marks are distinctive and famous for a number of reasons. First, "ChinaMartUSA.com", the Domain Name with which the Marks are actually associated, comprises the top 3 Google hits for the search term "China Mart" out of over 100,000 hits and is the number one Google hit for the search term "ChinaMart" out of over 280,000 hits. Second, China Mart and its licensed affiliates have spent hundreds of thousands of dollars to establish the Mark's notoriety among manufacturers in China and wholesalers in the U.S. Thirdly, due to this marketing and outreach, China Mart, its licensed affiliates, and customers using China Mart's services earn many millions of dollars in sales each year.

AmeriCareers is estopped from arguing that the Marks are not protectable or distinctive and therefore it is fairly using the Marks because AmeriCareers previously applied for a registration of "CHINAMART.COM THE SAVINGS CONTINUE" as a trademark in Michigan. See *Plus Products v. Natural Organics, Inc.*, 223 U.S.P.Q. 27, 1984 WL 33 (S.D.N.Y. 1984) (the court found that the defendant cannot make a fair use defense by arguing that a mark is merely descriptive because it previously sought to register the term as a trademark); See also *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 257 (2d Cir. N.Y. 1962) ("If a competitor of a trade-mark owner seeks registration of the mark, that would be conclusive evidence of his intent to make a trade-mark use thereof. For these reasons [defendant] cannot now justify its trademark use by contending that the term is merely descriptive").

AmeriCareers may also argue that the only relevant time period for judging bad faith is the time of "registration" and that at that time China Mart had not yet begun using the Marks. This position would not be supported by case law, as Justice Sonia Sotomayor, now Supreme Court Justice, indicated that "Congress intended the cybersquatting statute to make rights to a

16

domain-name registration contingent on **ongoing conduct** rather than to make them fixed at the time of registration" and that any court that treats "a registrant's right to use a domain name as akin to a property interest, fixed by events that occurred at a specific point in the past" is in error. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385-386, FN 13 (2d Cir. N.Y. 2003) (holding that the defendant's right to use the domain was contingent on his ongoing legal use of that domain name) (cited to by the Sixth Circuit, on other grounds). Indeed, even if a defendant can cite to the fact that the plaintiff did not use a trade name at a time of the domain's original registration, **a defendant's future shift in the focus of their business can demonstrate bad faith**. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 436 (4th Cir. Va. 2011) (holding that a website's post-registration shift in focus from an innocent subject to the subject of a trademark holder's business is evidence of bad faith). In this case, AmeriCareers acquired the domain name in 2007 and simply parked it. It was not until late July, 2010, more than 30 months later, that AmeriCareers shifted the focus of its website and began to market Chinese products sold by Amazon. Defendant's Exhibit A ¶ 10. The shift was a direct response to China Mart's July 7, 2010 letter to Ouyang indicating that AmeriCareers was infringing on China Mart's Marks. Naturally, after realizing that customers seeking Chinese goods were mistakenly entering its website, AmeriCareers, in bad faith, shifted the focus of its website from essentially doing nothing (parking) to selling Chinese goods. It is important to note also at this time that upon shifting the focus of the Domain Name in late July, 2010, AmeriCareers did not put a disclaimer indicating that it was not affiliated with China Mart.

AmeriCareers may argue that the ACPA permits AmeriCareers' use of the domain as "fair use" pursuant to 15 U.S.C. §1125(d)(1)(B)(ii), however, any argument on the part of AmeriCareers that its use of the Marks is a "fair use" is entirely without merit. In order for there to be a permissible fair use, the use must be "other than as a mark." 15 U.S.C. § 1115(b)(4). In this case, for many reasons it is clear that AmeriCareers did not intend for its use to be other than as a mark. Such reasons include the fact that it created "China Mart, LLC" in Michigan, that it has created a logo, that it has created a slogan ("Chinamart.com The Savings Continue"), and that it has registered "CHINAMART.COM THE SAVINGS CONTINUE" as a putative trademark in Michigan. *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251 (2d Cir.), cert. denied, 371 U.S. 910 (1962) ("If a competitor of a trade-mark owner seeks registration of the

mark, that would be conclusive evidence of his intent to make a trade-mark use thereof"). In addition, courts have found that use of a word as a domain name is use as a mark and is not eligible for the fair use defense. *Tcpip Holding Co. v. Haar Communs.*, 244 F.3d 88 (2d Cir. N.Y. 2001). Accordingly, AmeriCareers has no fair use defense.

**F.      China Mart Will Prevail On Its Trademark Infringement And Unfair Competition Claims Because AmeriCareers Used China Mart's Trademark And Caused Actual Confusion.**

Trademark infringement occurs when there is (1) a valid trademark and (2) likelihood of confusion from the defendant's use of the mark. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). Here, China Mart owns a valid US Trademark Registrations in CHINA MART and CHINAMART, and AmeriCareers creates not just a likelihood of confusion-but also actual confusion-by using the Mark in the infringing domain name to misdirect consumers to AmeriCareers' competing website where it began offering its services in competition with China Mart.

Traditionally, courts in this circuit look to the "Frisch factors" to determine whether there is a likelihood of confusion. *GMC v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. Mich. 2006). The factors are: (1) strength of the Plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the Defendant's intent in selecting its mark; (8) likelihood of expansion of the product lines. *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1173 (9th Cir. 2007) ("The test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them").

In the Internet context, the three most important Frisch factors are: (1) the similarity of the marks, (2) the relatedness of the goods and services, and (3) the parties' simultaneous use of the Web as a marketing channel. *Perfumebay.com, 506 F.3d at 1173*. When these factors suggest that confusion is likely, the other factors must weigh strongly against a likelihood of confusion to avoid finding infringement. *Id.* Here, (1) the Infringing Domain is identical to China Mart's Mark, (2) the parties are competitors in that China Mart as part of its business model additionally markets China Mart client goods as compared to AmeriCareers which also markets goods of

others (essentially simply linking to Amazon.com's offered goods), and (3) they both use the Web as a marketing channel. Those factors, and others, have created confusion, are likely to continue to create confusion.

The Chinamart.com domain name solely differs from the registered mark "China Mart" in that it adds the ".com" extension. Federal courts have agreed that "domain names that are substantially the same as a trademark are confusingly similar and create a presumption of confusion." See *E. & J. Gallo Winery v. Spider Webs Ltd.*, 129 F. Supp. 2d 1033, 1043 (S.D. Tex. 2001); citing *People for the Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915, 920 (E.D. Va. 2000); *Shields v. Zuccarini*, 89 F. Supp. 2d 634, 639 (E.D. Pa. 2000); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 188 (W.D.N.Y. 2000). Indeed, there is absolutely no difference in where you end up if you type in chinamart.com or ChinaMart.com in your internet browser. Indeed, as AmeriCareers' own attorney Mr. Berryhill confirmed in his Declaration provided in another case, "direct navigation" is a way that consumers seek information. Moreover, Mr. Berryhill also confirmed that the best way to determine whether someone has trademark rights is to perform a Google search. Undoubtedly, given the press and development of China Mart as of December 2007, AmeriCareers was well aware of China Mart's presence, even if sophisticated user Ouyang (who has apparently registered 17 marks by himself) failed to perform a search with the United States Trademark Office.

There can be no doubt that the Chinamart.com domain is confusingly similar to the China Mart mark.

Perhaps the best indicator of likelihood-of-confusion is evidence of actual-confusion. Stephen Perl, China Mart's CEO indeed heard from several China Mart prospective clients and clients (both in China and the United States), including as early as 2010, that those consumers (who had heard about ChinaMart in Trade Fairs, Seminars and through other media) were confused because they had tried to go onto Chinamart.com but were not finding all of the service information concerning the ChinaMart platform. In other words, they were indicated to Stephen Perl that, while they were seeing the marketing of goods, the consumers were not seeing the human resources, consulting and other business services (such as concierge services). Additionally, consumers indicated to Mr. Perl that they had tried to contact "ChinaMart" through "ChinaMart.com," but they had not received return communications. Of course, that would

make sense since AmeriCareers had nothing to do with ChinaMart. Considering the above factors alone necessarily results in a finding of a likelihood of confusion due to AmeriCareers' infringing use of the Marks.

## G.     China Mart's Trademark Registrations Were Not Procured By Fraud

Fraud in obtaining a federal trademark registration generally requires finding that the applicant made a false, material misrepresentation of fact with knowledge of its falsity and with the intention of misleading the US Trademark Office into granting a registration, which would not have been granted but for the material misrepresentation. It must be shown that the applicant actually knew or believed that the misrepresentation was false. See, for example, *Metro Traffic Control v. Shadow Network, Inc.*, 104 F.3d 336 (Fed. Cir. 1997); *Torres v. Cantine Torresella, S.r.l.*, 808 F.2d 46 (Fed. Cir. 1986). The cases have consistently distinguished between false and fraudulent statements. Specifically, false representations involving honest misunderstandings, inadvertence, negligent omissions or the like will **not** result in finding fraud on the US Trademark Office where there is no willful intent to deceive. *See*: *Metro Traffic Control, supra*, citing *Smith International, Inc. v. Olin Corp.*, 209 USPQ 1033 (TTAB 1981) and *Kemin Industries Inc. v. Watkins Products, Inc.*, 192 USPQ 327 (TTAB 1976).

Not only is Americareers unable to show any material intent to deceive the US TRADEMARK OFFICE into granting China Mart's registrations, it has failed to show any defects, misstatements or mistakes in connection with their registration and use that could be a basis for such a determination. *Metro Traffic Control v. Shadow Network Inc.*, 104 F.3d 336 (Fed. Cir. 1997), citing *Smith International, Inc. v. Olin Corp.*, 209 USPQ 1033 (TTAB 1981) and *Kemin Industries Inc. v. Watkins Products, Inc.*, 192 USPQ 327 (TTAB 1976). Fraud in connection with procuring a federal trademark registration requires a showing that the applicant knew such statements to be false and submitted them with the intent to mislead the US TRADEMARK OFFICE into granting a registration. *Metro Traffic Control v. Shadow Network Inc., supra*. AmeriCareers has not only failed to actually demonstrate any issues with respect to the accuracy and truthfulness of the statements in the China Mart application, it has further failed to suggest any evidence showing a knowing misrepresentation or intent to deceive the US Trademark Office. This defense is fatally flawed and should be dismissed.

Respectfully submitted,

Dated:  November 1, 2013                     China Mart USA, LLC

By:   /s/ Scott E. Shapiro
Scott E. Shapiro (CBN194352)
Attorney for Plaintiff and Counterclaim-Defendant
pro hoc vice
APPELL SHAPIRO, LLP
15233 Ventura Blvd., Suite 420
Sherman Oaks, CA 91403
Tel: (800) 625-7710
Email: scott@asattorney.com

John A. VanOphem (P48804)
Attorney for Plaintiff and Counterclaim-Defendant
BEJIN VANOPHEM & BIENEMAN PLC
300 River Place Dr., Ste 1650
Detroit, MI 48207
Tel: (313) 528-4882
Email: vanophem@bvbip.com